IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

FEBRUARY 1998 SESSION

**FILED**

**June 19, 1998**

**Cecil W. Crowson**
**Appellate Court Clerk**

| | | |
|---|---|---|
| STATE OF TENNESSEE, | * | C.C.A. No. 01C01-9612-CR-00531 |
| Appellee, | * | DAVIDSON COUNTY |
| VS. | * | Honorable Seth Norman, Judge |
| SIDNEY M. EWING, | * | (Felony murder; Attempted especially aggravated robbery; Assault) |
| Appellant. | * | |

For Appellant:                           For Appellee:

John B. Blair, III                          John Knox Walkup
176 Second Avenue North            Attorney General & Reporter
Suite 406
Nashville, TN  37201                    Lisa A. Naylor
                                                  Assistant Attorney General
                                                  Cordell Hull Building, Second Floor
                                                  Criminal Justice Division
                                                  425 Fifth Avenue North
                                                  Nashville, TN  37243-0493

                                                  Kimberly Haas
                                                  Assistant District Attorney General
                                                  Washington Square, Suite 500
                                                  222 Second Avenue North
                                                  Nashville, TN  37201-1649

OPINION FILED:_____

AFFIRMED

GARY R. WADE, JUDGE

<u>OPINION</u>

The defendant, Sidney M. Ewing, was convicted of the felony murder and attempted especially aggravated robbery of James Mayberry and the simple assault of Gary Frye. The jury returned a sentence of life without parole for the felony murder. The trial court imposed a Range I, twelve-year sentence for the attempted especially aggravated robbery conviction and an eleven-month, twenty-nine-day sentence for the simple assault conviction. All sentences are to be served concurrently.

In this appeal of right, the defendant presents the following issues for our review:

>   (1) whether the evidence was sufficient to sustain the conviction;
>
>   (2) whether the state suppressed <u>Brady</u> material;
>
>   (3) whether the trial court erred by allowing Gary David Frye to testify;
>
>   (4) whether during closing argument the prosecutor improperly used religious references and "crocodile tears"; and
>
>   (5) whether the state withheld <u>Jencks</u> material.

We find no error and affirm the judgment of the trial court.

Gary David Frye had lived at the business location of Doris Salvage and worked for the victim, James Mayberry. Frye, an alcoholic, testified that the victim routinely dealt in cash in the conduct of his business and engaged in large transactions on Fridays and Mondays. He was aware that the victim often carried a chrome-plated .38 caliber Smith and Wesson in his right front pocket for protection. At trial, Frye recalled that on January 23, 1995, a Monday, he and the victim sold a

2

load of scrap metal for seven hundred dollars. Payment was tendered by check and they stopped by the bank before returning to their business location. Later that afternoon, Frye saw the victim with an amount of cash. Frye and the victim closed the store and padlocked the front entrance at about 4:00 P.M. Charles Terpstra, also an employee at the business, joined them for dinner in an apartment located at the business site. Frye acknowledged that he and Terpstra consumed several beers that evening but denied being intoxicated.

Between 5:00 and 5:30 P.M., the defendant stopped by to pawn a leather jacket. When the victim refused, the defendant took a seat on the couch and watched television with the others, explaining that he wanted to use the telephone. Terpstra left between 6:30 and 7:00 P.M. Frye, who had dozed off in his chair, recalled being awakened suddenly by the victim's screams. Frye testified that he was sitting less than six feet from the victim when he saw the defendant pin the victim in the chair and hold a shiny object, possibly a screwdriver, to his neck. When Frye attempted to assist the victim, he was struck by the defendant in the left shoulder. Frye remembered that he buckled under the force of the blow and that the victim fell on him. Frye recalled feeling the pain of the victim's kneecap in his back and heard the following exchange between the defendant and the victim:

| Victim: | What do you want? |
| Defendant: | I want your money. |
| Victim: | Let me up, and I'll give it to you. |
| Defendant: | Is that all of it? |
| Victim: | Oh, Lord, I see the trees a'coming. |

Frye described the victim's voice as full of dread. He then heard two shots, "pop, pop." When the defendant left, Frye called for help. He claimed that the 911 operator told him to hang up and call the regular operator, which he did. He testified that he had known the victim had been shot because he was not moving and his head was surrounded by blood. Frye stated that he did not realize at the time that

he had also been shot. When Terpstra returned to the shop shortly thereafter, Frye told him not to come into the room. Frye accompanied police to the station to give a statement when an officer noticed that Frye had been shot in his back left shoulder and had a wound on the top of that shoulder. After the death of the victim, Frye lived on the streets. About two weeks before trial, he entered a de-tox program at a Nashville hospital.

Frye denied that he passed out rather than dozed off on the night in question. He also denied that his level of intoxication prevented him from realizing he had been shot. He did admit that he was not wearing his prescription eyeglasses the night of the shooting but explained that he could see adequately for a distance of three to six feet and had good hearing.

Charles Speight, an emergency medical technician with the Metro Fire Department, responded to the call. Because the victim had fallen up against the door, he had difficulty entering the building. At trial, Speight testified that he had to pull the victim away from the door and turn him over to check his vital signs. He recalled that the victim, who had been shot in the back of the head, had experienced a "devastating injury" and could not be revived. Speight noticed abrasions on the body which may have resulted from a struggle and observed a burn to the chest which could have been caused by a hot barrel of a recently-fired gun.

Homicide Detective Tim Mason, who assisted in the investigation of the victim's death, spoke with the victim Frye on the night of the murder. He did not smell any alcohol during their discussions and did not believe that Frye was intoxicated. When he had noticed blood on Frye, he asked him to remove his shirt. Detective Mason then observed an entrance wound on his back and an exit wound

4

on his front. He saw other abrasions on his back. He asked Frye if he was in pain and then informed him that he had been shot. Frye was then taken to the hospital.

Officer Raymond Rader, Jr. collected two bullets, a brown leather jacket, a blue jean jacket and a screwdriver from the crime scene. He found one hundred dollars in cash in the victim's pocket and two knives underneath a couch cushion.

Detective Al Gray testified that he had interviewed Frye, Terpstra and Doris Salvage employee Jackie Hill, another employee of the victim. He brought the defendant into custody and recorded his statement. In the tape recorded statement, the defendant told Detective Gray that he had stopped by Doris Salvage to sell the victim a jacket but the victim had refused. He claimed that the victim then used racial slurs and they had argued. The defendant contended that the victim took a gun from his pocket and the two men then wrestled over the gun. He claimed that Frye attempted to intervene and was knocked down; at that point, the victim fell and the gun discharged. The defendant denied having a weapon and denied taking any cash from the victim. After the shooting, the defendant claimed that he walked to the projects, leaving his coat behind, and told no one about the shooting.

During the interview, Detective Clifford Douglas asked the defendant to clarify the struggle that led to the shooting:

> Detective: [Y]ou said ... he managed to get shot, explain that.
> Defendant: [H]e was falling back, he fell right. So I let go of his hand ... [a]nd then he tripped. And I guess that's when it went off.
> Detective: Now, you probably don't know the dimension on where he was shot at, we do, okay. And, you going to have to come up with a better angle on his falling back like that ....

5

Detective: So did you have your hand on the gun in any way?

Defendant: On his wrist.

Detective: Okay, and ya'll were just -- just wrestling over the gun?

Defendant: Well, I really can't show you with my handcuffs; but anyway kind of went upward like this here way ... and laid his hands up like this when the gun kind of went off.

Detective: Okay. You['re] saying his gun was raised up by his neck?

Detective: [H]ow many times did the gun go off?

Defendant: Once.

Detective: [Y]ou need to really think about exactly how ya'll wrestling. Because it's going to be some kind of discrepancy on where he was shot at and how he was shot compared to how you say ya'll were wrestling. ...

Defendant: [H]is hands was up like this here ....

Detective: [Y]ou got your hands behind your head.

Detective: You need to kind of get that together cause it ain't going to match up.

Defendant: Can you turn it off for a minute.

Detective: [W]e discussed some discrepancies in the evidence that we found at the scene and what you was telling us, and you wanted to clear this up. So go ahead and clear that spot up for us.

Defendant: Okay, what happened me and [the victim] was scuffling. So I happened to snatch the gun away from him; and, when I snatched it away from him, the gun went off.

Detective: And where you think it hit him?

Defendant: Somewhere up in the shoulder ....

Detective: In the front or the back?

Defendant: In the back.

Detective: Then [the victim] fell?

Defendant: He fell on, yeah. ... He fell over on the other guy. ... I threw [the gun] over on the couch, and I went on out the door.

Detective: Did [the victim] fire at you from the (inaudible)?

Defendant: Well, when he first pulled [the gun] out ... it went off. ... About the time he come out with the pistol, BLAM. That's when I knew he meant business.

Detective: [Y]ou sure it was just one shot you fired?

Defendant:    That's all.

Detective Gray acknowledged that he had no direct proof that the defendant had taken any money from the victim although some cash plainly protruded from the victim's pocket.  He testified that he had obtained warrants for criminal homicide and aggravated assault and had not obtained a warrant for attempted robbery even though he could have done so based upon the results of his investigation.  He stated that there was no evidence that the defendant was armed when he arrived at Doris Salvage.

Detective Douglas testified that he thought the defendant had initially denied ever touching the gun, asserting that the victim had shot himself.  He recalled that the defendant later admitted that he had snatched the gun from the victim and, at that time, the gun had discharged.

Dr. Jessie Giles the forensic pathologist who performed the autopsy testified that the bullet entered the back of the victim's neck just below the base of the skull, passed through his spinal column, and exited under the chin.  The bullet traveled slightly to the left and downward, inflicting a fatal wound.  The victim suffered additional wounds, including a burn to his chest and a laceration of the left abdomen.  There were small cuts and scrapes around the victim's nose and eyes which could have been caused by a punch, kick or fall.  Dr. Giles testified that he found no injuries to the victim's hands.

On this proof, the jury returned verdicts of guilt to felony murder, attempted especially aggravated robbery of the victim and simple assault of Frye. At the sentencing hearing, the state presented proof that the defendant had a 1980

7

conviction for second degree murder and then called family members to testify. JoAnna Anderson, the victim's daughter, recalled her father as a loving and caring person who helped others. She described the death of her father as devastating and that the incident had changed her as a person. She testified to feeling fear and loss and explained that, since the murder of the victim, her children have had difficulty sleeping and dealing with their emotions. Ms. Anderson testified that when she found out the defendant had a previous conviction for second degree murder, she was angry and upset that the justice system was not working. Eighty-six-year-old Ernestine Mayberry described the victim as a thoughtful and good person. She testified that his death had had a negative effect on her.

The defendant testified at the sentencing hearing that he felt the victim's death was justifiable because the victim had threatened him with deadly force. The defendant maintained that he had felt that his life was in danger. He asserted that he had never tried to rob the victim.

The jury found that the defendant had been previously convicted of one or more felonies involving violence to a person and that the murder was committed for the purpose of avoiding arrest or prosecution. Tenn. Code Ann. § 39-13-204(i)(2), (6). The jury unanimously sentenced the defendant to life without the possibility of parole.

I

The defendant contends that the evidence was insufficient to support the verdict for felony murder and attempted especially aggravated robbery. He does not contest the sufficiency of the evidence for the simple assault conviction.

8

On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); Tenn. R. App. P. 13(e).

At the time of the offense, felony murder was defined under the 1989 Act as "a reckless killing of another committed in the perpetration of, or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2) (Supp. 1994). To sustain a conviction for felony murder, "the killing must have been in pursuance of, rather than collateral to the unlawful act described by the statute." State v. Severs, 759 S.W.2d 935, 938 (Tenn. Crim. App. 1988). The death of the victim must have had "an intimate relation and close connection with the felony, ... and not be separate, distinct, and independent from it ...." State v. Farmer, 296 S.W.2d 879, 883 (Tenn. 1956).

Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). Especially aggravated robbery is robbery "[a]ccomplished with a deadly weapon; and ... [w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a). A person commits criminal attempt who, "acting with the kind

of culpability otherwise required for the offense: ... [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes as substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3).

The mental state of intentional is satisfied "when it is the person's conscious objective ... to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a). A person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). One is reckless "when the person is aware of but consciously disregards a substantial and unjustifiable risk [and to do so] constitutes a gross deviation from the standard of care that an ordinary person would exercise ...." Tenn. Code Ann. § 39-11-302(c).

The defendant argues that Frye's testimony is not credible to establish attempted especially aggravated robbery and, therefore, both the felony murder conviction and the robbery conviction must be reversed. The defendant contends that no reasonable juror could have found the testimony of Frye, an alcoholic with poor eyesight, to be reliable. The defendant points out contradictions in Frye's testimony and asserts that the state failed to prove that the defendant used a deadly weapon.

In our assessment, the proof is adequate. Frye testified that the defendant, using what appeared to be a screwdriver, threatened the victim. He heard the defendant demand of the victim, "I want your money." He remembered that the victim offered to comply. Then Frye heard the defendant ask, "Is that all of

10

it?" Just before Frye heard two shots fired, the victim, with a voice full of dread, said, "Oh, Lord, I see the trees a'coming."

Although the state did not prove that the defendant actually took cash from the victim, the evidence, as accredited by the jury, established that the defendant attempted to take the victim's cash by force, using a screwdriver. A screwdriver may be considered a deadly weapon. See Tenn. Code Ann. § 39-11-106(a)(5)(B). Demanding money and holding a weapon to the victim's throat are substantial steps toward completion of the offense. During the robbery attempt, the victim sustained serious bodily injury. He was shot in the back of his neck and sustained other abrasions and a burn. See Tenn. Code Ann. § 39-11-106(a)(34) (1997). The defendant's words suggest that his acts were intentional or knowing. After demanding money, the defendant fired two shots in quick succession and the defendant fled. The bullet fatally wounded the victim cutting a path from the back of his neck through his spinal cord. When firing the gun, the culpability of the defendant was at the very least reckless.

As for the credibility of Frye, it was the prerogative of the jury to determine whether his testimony was truthful. This court neither reweighs nor reevaluates the proof. The verdict of guilt accredits the proof offered by the state, including Frye's recollection of the offenses. In our view, a rational trier of fact could have found beyond a reasonable doubt that the evidence was sufficient to support the convictions of first degree murder during the commission of a felony and attempted especially aggravated robbery. See Jackson v. Virginia, 443 U.S. 307 (1979).

II

The defendant next argues that the state suppressed favorable material in violation of Brady v. Maryland, 373 U.S. 83 (1963), and thereby denied the defendant a fair trial. The state contends that because the information was disclosed during trial, no prejudice to the defendant resulted.

In the landmark case of Brady v. Maryland, the United States Supreme Court ruled that the prosecutor has a duty to furnish exculpatory evidence to the defendant. 373 U.S. at 87. Exculpatory evidence may pertain to the guilt or innocence of the accused and/or the punishment which may be imposed if the accused is convicted of the crime. State v. Marshall, 845 S.W.2d 228 (Tenn. Crim. App. 1992). The Supreme Court in Brady reasoned that a fair trial and a just result could not be obtained when, at the time of trial, the prosecution suppressed information favorable to the accused. Brady, 373 U.S. at 87-88.

Any "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. This duty to disclose extends to all favorable information irrespective of whether the evidence is admissible. Branch v. State, 469 S.W.2d 533 (Tenn. Crim. App. 1969). Information useful for impeaching a witness is considered favorable information that the prosecutor may not withhold. Giglio v. United States, 405 U.S. 150 (1972). And, while Brady does not require the state to investigate for the defendant, it does burden the prosecution with the responsibility of disclosing statements of witnesses favorable to the defense. State v. Reynolds, 671 S.W.2d 854, 856 (Tenn. Crim. App. 1984). The duty does not extend to information that the defense already possesses or is able to obtain or to information

12

not in the possession or control of the prosecution. Banks v. State, 556 S.W.2d 88, 90 (Tenn. Crim. App. 1977).

Before this court may find a due process violation under Brady, the following elements must be established:

> 1.     The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
>
> 2.     [t]he State must have suppressed the information;
>
> 3.     [t]he information must have been favorable to the accused; and
>
> 4.     [t]he information must have been material.

State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995) (as amended on rehearing).

In Edgin, our supreme court adopted the following standard for materiality:

> [T]here is constitutional error "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." ... "[T]he touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'"

Edgin, 902 S.W.2d at 390-91 (quoting Kyles v. Whitley, 115 S. Ct. 1555, 1566 (1995)).

The defendant maintains that he filed a motion for discovery in which he made a special request for "favorable information," including interview reports or

13

memoranda which might contradict the evidence the state anticipated presenting at trial. The discovery motion is not included in the technical record.

At trial, following the testimony of Detective Porter, defense counsel requested Jencks material and the state provided the trial court with the investigatory notes made during interviews for an in camera review. At the conclusion of a jury out hearing, the court found as follows:

> In reviewing this, there are two pieces of it ... seems to me may be Brady. [The victim] was shot in the back of the head .... According to the [summary statement of Frye] by Detective Porter, [the victim] was laying face up at the time he was shot. ... First of all, there's ... nothing in there that, "I see the trees coming," or "Give me your money," "If you let me get up, I'll get the money," ... [The summary] says (reading):
>> The victim, holding a knife to his throat was saying, "Where's the money?" Mr. Frye states he attempted to assist the victim and the suspect hit him, knocking him to the floor. As Frye was lying on his stomach ...
> The witness, he's laying face down on the floor. And the victim ends up lying on top of him. And then in parenthesis, Frye (reading):
>> And the victim is face up. Mr. Frye states that he heard two shots and the suspect ran out the door.
> And based on this, the victim is laying face up when he was shot. ... <u>I think the Defendant is entitled to that because I think that is potentially exculpatory because his testimony doesn't seem consistent with what the rest of the evidence is going to show</u>. ... [T]he State should have voluntarily turned this over to the defendant a long time ago because <u>if it's the State's theory ... that [the victim] was shot in the back of the head, and the State has information that [the victim] was lying face up when he was shot, the only way he could have been shot would have been by the individual underneath him</u>. ...
>                           ***
> The other thing that I believe is exculpatory is the statement taken by Detective Gray from Mr. Anthony Love where he says (reading):
>> Love said he saw [the defendant] driving the victim's truck. And according to the victim, [the defendant did] not return the victim's truck until the next day. Love said the victim was irritated with [the defendant] for that.

14

***
> [W]hen a self-defense issue is raised, and there is
> indications, right or wrong, during the investigating stage,
> that the victim may, for whatever reason, according to
> this, misappropriating his truck or whatever, be upset
> with the Defendant, I submit that that's possibly
> exculpatory evidence.

(Emphasis added).

The trial court provided the defendant with portions of the detectives' notes that were found to be potentially exculpatory. The notes are not included in the record. Only the court's recitation of those notes indicate their contents. The trial court further found that the state had not intentionally withheld the evidence and that there was no prejudice to the defendant.

The defendant contends that failure of the state to disclose this evidence prior to trial warrants the remedy of a new trial. The state argues that the information was not material or exculpatory and, because it was disclosed during trial, the defendant was not prejudiced. The state relies on State v. Jim Inman, C.C.A. No. 03C01-9201-CR-00020 (Tenn. Crim. App., at Knoxville, Nov. 23, 1993), app. denied, (Tenn. 1994).

In Inman, Michael Buzi was murdered and Albert Tizov was severely beaten during a jewelry sale in Inman's home. Tizov provided the state with a written statement and a tape-recorded statement which was transcribed. The state did not disclose the transcript or the written statement of Tizov to the defense until after the state's direct examination of Tizov. Inman argued on appeal that the transcript contained Brady material. This court held that in terms of prejudice, the statements in the transcript were "inconsequential, given the remaining proof." Inman, slip op. at 19. The panel ruled that "If previously undisclosed evidence is

15

disclosed during trial, then no Brady violation occurs unless prejudice results from the delayed disclosure." Id. (citing United States v. Wood, 806 F.2d 658, 665 (6th Cir. 1986)). Delayed disclosure results in prejudice to the defendant and may deny the defendant due process when it is "too late for the defendant to make use of any benefits of the evidence." Nassar v. Sissel, 792 F.2d 119, 121 (8th Cir. 1986).

Here, the trial court provided the evidence to the defendant on the first day of trial before conclusion of the recross-examination of Frye. The defendant did not request a continuance or recall Frye, who was still under subpoena, during the remainder of the trial or sentencing hearing. Thus the defendant had ample opportunity to use the evidence in question during trial.

The witness Love was equally available to the defendant and to the state. His name and address were included on the indictment. He lived next door to the defendant's grandmother. Yet, after the state's direct examination of Love, the defendant chose not to cross-examine. Nor did defense counsel attempt to elicit Love's testimony that the victim was mad at the defendant over the misuse of his truck, which possibly could have furnished some support to the defendant's claim of self-defense. In our view, the defendant was not prejudiced by the delayed disclosure. The defendant would not be entitled to a new trial on this ground.

III

The defendant also maintains that the trial court erred by allowing Frye to testify because the state disregarded its continuing duty to disclose discoverable information under Rule 16(c), Tenn. R. Crim. P. The state included Frye's name and last known address on the indictment. See Tenn. Code Ann. § 40-17-106. Although defense counsel made a concerted effort to locate and interview Frye, he

was unable to do so. The state responds that after the victim's death, Frye became homeless and had no address. The prosecutor asserted that she promptly informed defense counsel of Frye's location at a Nashville hospital several days before trial.

The trial court heard the arguments of counsel at the motion in limine. Frye testified that he was an eyewitness to the murder of the victim and that, although he was a resident of Nashville, he had no address. He slept on docks or in old junk cars. He did not keep the District Attorney's office advised of his location and admitted that he would be a difficult person to locate. Frye testified that at the time of trial he lived at Meharry Hospital in a de-tox unit. He specifically recalled that about a week earlier defense counsel had contacted him to request an interview. Frye testified that he had refused and would do so again. The trial court found no bad faith on the part of the prosecution and no prejudice to the defendant, "it's ... crucial that [Frye] was here last Monday and apparently ... refused to talk at that time."

The pretrial discovery motion by the defense is not in the record. It is the duty of the appellant to prepare a record that conveys a fair, accurate, and complete account of what transpired in the trial court with respect to the issues that form the basis for the appeal. Tenn. R. App. P. 24(b); State v. Miller, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987). When the record is incomplete and does not contain information relevant to a particular issue, this court may not make a ruling. State v. Cooper, 736 S.W.2d 125, 131 (Tenn. Crim. App. 1987). In the absence of an adequate record, this court must presume the correctness of the trial court's ruling. Appellate courts may only review what is in the record and not what might have been or should have been included. Dearborne v. State, 575 S.W.2d 259, 264 (Tenn. 1978). In consequence, we defer to the ruling of the trial court.

17

Even if the discovery motion had been included in the record, the defendant would not be entitled to relief. There has been no showing of prejudice. When there has been a failure to produce discoverable material within the allotted time, the trial judge has the discretion to fashion an appropriate remedy, such as a continuance. Tenn. R. Crim. P. 16(d)(2). Whether the defendant has been prejudiced by the failure to disclose is always a significant factor. State v. Baker, 751 S.W.2d 154, 160 (Tenn. Crim. App. 1987). Exclusion of the evidence is a drastic remedy and should not be implemented unless there is no other reasonable alternative. See, e.g., State v. House, 743 S.W.2d 141, 147 (Tenn. 1987).

In this instance, the defendant knew Frye would be his primary accuser. The name was included on the indictment. The only possible prejudice to the defendant was the lack of opportunity to investigate Frye's background. Frye, however, testified that he rarely stayed in one place more than one night and he was emphatic in his refusal to talk with defense counsel. Moreover, the trial court had instructed the state to make Frye available sometime before the trial began if Frye would talk with defense counsel. Such a witness is not required to cooperate with the defense so long as that failure to cooperate does not result from any action on the part of the state. State v. Singleton, 853 S.W.2d 490, 493 (Tenn. 1993).

IV

The defendant asserts that the prosecutor acted improperly during closing argument. He challenges the state's use of religious references, including use of the phrase, "I pray." He also asserts that the prosecutor displayed "crocodile tears" to inflame the jury. On this basis, defense counsel requested a mistrial, which the trial court denied.

Trial courts have substantial discretionary authority in determining the propriety of final argument. Although counsel is generally given wide latitude, courts must restrict any improper argument. Sparks v. State, 563 S.W.2d 564 (Tenn. Crim. App. 1978). Closing argument must be temperate, must be based upon evidence introduced during trial, and must be relevant to the issues at trial. State v. Sutton, 562 S.W.2d 820 (Tenn. Crim. App. 1978). The bounds of proper argument largely depend upon the facts in evidence, the character of the trial, and the conduct of opposing counsel. See State v. Byerley, 658 S.W.2d 134 (Tenn. Crim. App. 1983); Evans v. State, 557 S.W.2d 927 (Tenn. Crim. App. 1977); Gaston v. State, 506 S.W.2d 802 (Tenn. Crim. App. 1973).

The test to be applied in reviewing prosecutorial misconduct is whether "the improper conduct could have affected the verdict to the prejudice of the defendant." Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965). The factors are set out in Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976), as adopted by the Tennessee Supreme Court in State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984):

> (1) the conduct complained of, viewed in light of the facts and circumstances of the case;
>
> (2) the curative measures undertaken by the court and the prosecutor;
>
> (3) the intent of the prosecutor in making the improper argument;
>
> (4) the cumulative effect of the improper conduct and any other errors in the record; and
>
> (5) the relative strength or weakness of the case.

Both the state and the defense must be given the opportunity to argue not only the facts in the record but any reasonable inferences drawn therefrom. See Russell v. State, 532 S.W.2d 268 (Tenn. 1976). Confusing or irrelevant arguments should not

19

be permitted.  See Burns v. State, 591 S.W.2d 780 (Tenn. Crim. App. 1979);

Brazelton v. State, 550 S.W.2d 7 (Tenn. Crim. App. 1974).

Again, we are confronted with an incomplete record.  No transcript of the closing argument is included for our review.  The appellant has the duty to prepare a record that conveys a fair, accurate, and complete account of what transpired in the trial court with respect to the issues that form the basis for the appeal.  Tenn. R. App. P. 24(b); Miller, 737 S.W.2d at 568.  We may not rule on an incomplete record.  Cooper, 736 S.W.2d at 131.  In the absence of an adequate record, our court must presume the correctness of the trial court's ruling.  Appellate courts may only review what is in the record and not what might have been or should have been included.  Dearborne, 575 S.W.2d at 264.  Without the transcript of the prosecutor's closing argument, we cannot evaluate the appropriateness of the her remarks to and conduct before the jury.

V

In his final issue, the defendant contends that the state failed to maintain and produce Jencks material, pursuant to Rule 26.2, Tennessee Rules of Criminal Procedure.  The state maintains that the trial court correctly ruled the information in question was not Jencks material.

After the direct testimony of Detective Gray, the defendant demanded the notes made by the detective during the course of his investigation.  While Detective Gray conceded that he had used his notes to prepare his formal report, he asserted that the formal report contained the material included in his notes.  Upon further questioning, the trial court then determined from Detective Gray that the

report provided to defense counsel was "a typed transcript of [his] handwritten notes" and ruled that the Jencks rule had been satisfied.

The applicable rule defines Jencks material as follows:

(1)   A written statement made by the witness that is signed or otherwise adopted or approved by him; or

(2)   A substantially verbatim recital of an oral statement made by the witness that is recorded contemporaneously with the making of the oral statement and that is contained in a stenographic mechanical, electrical, or other recording or transcription thereof.

Rule 26.2(g), Tenn. R. Crim. P.  Investigation notes are not Jencks material because the information uncovered during investigation is not the signed, adopted or approved statement of the investigator/witness.  State v. Payton, 782 S.W.2d 490 (Tenn. Crim. App. 1989).  Nor do the investigation notes in question come within the purview of Rule 26.2(g)(2), as they are not stenographic, electrical or otherwise recorded and transcribed.  Id.; see State v. Daniel, 663 S.W.2d 809, 811-12 (Tenn. Crim. App. 1983).

Accordingly, the judgment of the trial court is affirmed.

_____
Gary R. Wade, Judge

CONCUR:


_____
William M. Barker, Judge


_____
Curwood Witt, Judge

21